FIAMINGO, J.T.C.
This is the court’s opinion with respect to the parties’ cross-motions for summary judgment. The issue presented is the interpretation and application of the statutory exceptions to the related party interest add-back provision of the New Jersey Corporation Business Tax, N.J.S.A. 54:10A-4(k)(2)(I).
For the following reasons, plaintiffs motion for summary judgment is granted and defendant’s cross-motion is denied.
I. Findings of Fact and Procedural History
The Court makes the following findings of fact based on the submissions of the parties in their cross-motions for summary judgment. R. 1:7-4.
A Morgan Stanley and Co., Inc.
Plaintiff, Morgan Stanley and Co., Inc. (“MS & Co”) is a global financial services firm that is a registered broker-dealer with the Securities and Exchange Commission. It is also registered with *202 the Commodity Futures Trading Commission as a futures commodities merchant. Its business activities include securities underwriting and distribution, financial advisory services, sales, trading, financing and market-making activities in equity securities, fixed income securities and related products. For the fiscal year ending November 30, 2003 it was a Delaware Corporation and wholly owned by Morgan Stanley. It transacted business in the State of New Jersey during the year in question and was subject to reporting under the New Jersey Corporation Business Tax Act (“NJ CBT”).
B. Morgan Stanley
Morgan Stanley (“MS”), a Delaware Corporation, is a global financial services firm whose commercial domicile is located in the State of New York. MS was subject to New York Corporation Franchise Tax for the year in question and was not subject to reporting under the NJ CBT.
MS & Co entered into a number of financial transactions with MS and/or MS’ various subsidiaries and affiliates, including a Cash Subordination Agreement and Subordinated Revolving Credit Agreement (Subordinated Debt); an arrangement termed a “Cash Management Arrangement”; and numerous Intercompany Transactions.
1. Subordinated Debt. This category of financial transactions includes cash subordinated loans and subordinated revolving credit agreements. MS & Co signed loan agreements to borrow money from MS and to repay the loans with interest.
MS was responsible for substantially all of the external borrowing done on behalf of MS & Co and MS’ other subsidiaries. Some or all of the subordinated debt between MS & Co and MS was funded by the external debt obtained by MS. None of the external debt obtained by MS was guaranteed by MS & Co.
2. Cash Management Agreement. MS & Co borrowed money from MS on a short term basis to meet daily cash demands exceeding funds available to MS in its cash accounts.
*203 3. Intercompany Payables. During the tax year in question, there existed a number of intercompany payable balances as a result of which MS & Co owed money to one or more related entities. Interest was charged on intercompany payable balances to reflect the income and expenses of each entity.
For the year under review, interest reported as paid or accrued by MS & Co to MS and its affiliates for the various categories of debt were as follows: Subordinated Debt — $216,029,306; Cash Management Arrangement — $41,434,998; and Intercompany Loans — $177,813,929, for a total of $435,277,232.
C. Morgan Stanley Biscay, LLC
Morgan Stanley Biscay, LLC (“MS Biscay”) is a wholly-owned subsidiary of MS which was treated as a disregarded entity for federal tax purposes. An unnamed United Kingdom based financial institution (“Financial Institution A”) contributed the sum of £ 250,000,000 to Rockall, a Delaware general partnership, in exchange for a general partnership interest. Two other entities owned by Morgan Stanley Viking LLC (“Viking”), an affiliate of MS, contributed an additional £88,800,000, also in exchange for partnership interests. At the time of the contribution to Rockall by Financial Institution A Viking entered into an Acquisition Agreement whereby Financial Institution A agreed to sell and Viking agreed to purchase Financial Institution A’s partnership interest in Rockall on a specified date for a specified price. Rockall then transferred £ 338,800,000 to MS Biscay in exchange for a financial instrument requiring the repayment of a specified cash amount on certain predetermined dates.
MS & Co then borrowed £ 250,000,000 from MS Biscay under an arrangement whereby MS & Co was obligated to repay the amount of the loan, with interest, at the same rate at which Rockall was required to make partnership distributions to unrelated third parties. MS & Co also issued a guarantee to Financial Institution A for Viking’s payment obligations under the Acquisition Agreement, capped at a total of £250,000,000. The loan agreement between MS Biscay and MS & Co provided that MS & *204 Co’s loan obligations would be reduced to the extent that MS & Co was required to make payments under the guarantee agreement.
As a result of the financial transactions MS & Co paid interest to MS Biscay in the amount of $15,019,370. For the year in question, MS Biscay had an overall loss of $41,751,054.
D. Makatea JV, Inc.
Makatea JV Inc. (“Makatea”) was an entity in which MS had an ownership interest through certain of its affiliated entities. Maka-tea entered into a repurchase agreement with MS & Co by which Makatea transferred the sum of $1,357,000,000 in exchange for the transfer to it of certain collateral by MS & Co and MS & Co’s agreement to repurchase the collateral at a future date for a premium, categorized by plaintiff as an interest expense.[1] Maka-tea also provided an unsecured loan to MS & Co in the amount of $145,000,000. The total amount of the funds involved was $1,502,000,000.
A portion of the funds financing the repurchase arrangement and the loan from Makatea to MS & Co was provided by an unnamed French based financial institution (“Financial Institution B”) which purchased preferred stock in Makatea for the aggregate amount of $1,000,000,000.[2] An affiliate of MS, Morgan Stanley Moorea (“Moorea”) contributed $500,000,000 to Makatea in exchange for common stock in that company.[3] Moorea, through an unnamed disregarded entity, also entered into a put option with Financial Institution B under which Financial Institution B had the right to sell the preferred shares to that disregarded entity. *205 Another disregarded entity of Moorea entered into a call agreement whereby the disregarded entity had the right to purchase the shares from Financial Institution B.
For the year in question MS & Co incurred interest expense to Makatea in the amount of $91,381,239. MS & Co acknowledges that Makatea is a related party for the purposes of the NJ CBT.
E. Providence DE Investments, LLC
In this group of financial transactions[4], an unnamed Canadian based financial institution (“Financial Institution C”) contributed $500,000,000 to Providence Cayman Investments Limited (“PCIL”) in exchange for its Class 1 Common Stock. Simultaneously, Morgan Stanley International (“MSII”) entered into a put/call agreement with Financial Institution C whereby Financial Institution C agreed to sell and MSII agreed to purchase the Class 1 Stock on a specified date at a specified price.
PCIL contributed the funds received to Providence DE Investments Co. which then contributed them to Providence DE Funding Co. (“PDFC”) which in turn lent the funds to MS. MS then purchased a certificate of deposit issued by Financial Institution C in the face amount of $500,000,000 which MS then pledged to Financial Institution C to secure the obligations of MSII under the put/call agreement. Upon maturation of the certificate of deposit, the pi’oceeds in the amount of $553,000,000 were delivered to PDFC. PDFC then contributed the $553,000,000 to Providence DE Investments LLC (“Providence”). MS & Co entered into a Tri-Party Repurchase Agreement with Providence whereby it received $553,000,000 in exchange for the transfer of certain collateral and MS & Co’s agreement to repurchase the collateral at a specified date for a specific price. Providence also directly pledged the collateral provided by MS & Co to Financial Institution C to secure MSII’s obligations under the put/call Agreement. The difference between the initial price paid to MS & Co for the *206 collateral and the repurchase price paid by it was categorized as interest expense to MS & Co and income to Providence.[5]
Through these series of transactions the amount of interest expense paid by MS & Co to Providence for the fiscal year in question was $7,147,303. MS & Co acknowledges that Providence is a related party for purposes of the New Jersey Corporation Business Tax.
F. 2002 NY Consolidated Return[6]
On February 14, 2005, MS filed a 2002 New York General Business Corporation Combined Franchise Tax Return (“NY Return”) on a combined basis with MS & Co and certain related entities for the year ending November 30, 2003. The interest payments from MS & Co to MS, certain of its affiliates, and MS Biscay as a disregarded entity were included in the pro-forma separate-company federal return[7] and are reflected as interest income on the NY Return. The New York allocation factor shown on the New York return for the MS combined group was 34.2939% [8]
*207 The entire federal taxable income of MS and the combined group as shown on the pro-forma combined federal tax return was a loss of $207,682,215. This amount was also reported on the NY Return as Federal taxable income before net operating loss and special deductions, which is the starting point for the calculation of the franchise taxes due to the State of New York. This loss included interest income of $11,099,397,735 reported by MS as having been received from its combined group, which included MS & Co.
In calculating the tax due to New York State, MS was required to report the largest of its calculated tax on its combined minimum taxable income base, entire net income, combined capital base, or the fixed dollar minimum tax. The largest of these was the tax on combined capital base — a tax of $350,000.00. After credits available to MS, the tax due was reduced to $1,499* ***[9]. The return shows a minimum NY franchise tax imposed in the amount of $1,500.
Neither Makatea nor Providence were a member of the combined group for the purposes of reporting on the NY Return and therefore the transactions with those entities and MS & Co were not included in the NY Return. Additionally, some of the entities involved in the Intercompany Loan transactions referenced above were not members of the combined group for New York reporting purposes and those transactions were also excluded from the NY Return.
G. MS & Co 2002 New Jersey Corporation Business Tax Return
MS & Co filed a NJ CBT return for its fiscal year ending November 30, 2003 on November 15, 2004 (NJ Return). It *208 reported entire net income of $864,253,160 and a New Jersey allocation factor of 2.3794%. MS & Co reported related interest add-back of $206,459,736 which it had calculated by netting the total interest paid to related entities with the total interest received from related entities. MS & Co reported a NJ CBT tax due of $1,850,764, which it paid.
On November 30, 2004, Plaintiff filed an amended 2002 NJ CBT return on which it deducted all of its related interest add-back in calculating its entire net income and requested a refund of $442,126. On December 8, 2005, the Director denied the refund and assessed additional tax of $811,308 plus interest. In doing so, the Director denied plaintiffs claim for deduction of related interest and recalculated the amount of related interest add-back. On March 7, 2006, MS & Co filed a protest and request for hearing with the Conference and Appeals Branch of the New Jersey Division of Taxation which was held on November 27, 2006.
A Final Determination was issued by the Director on March 20, 2007 in which the amount of the related party interest expense was again recalculated, resulting in an increase of the interest add-back by $585,317,349, the reduction of the New Jersey allocation factor to 2.2881% and a deficiency in tax of $709,162 plus interest.[10]
II. Legal Issues and Analysis
A. Summary Judgment
Summary judgment should be granted where “the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show there is no genuine issue as to any material fact challenged and the moving party is entitled to a judgment or order as a matter of law.” R. 4:46-2(c). In Brill v. Guardian Life Ins. Co., 142 N.J. 520, 523, 666 A.2d 146 (1995), our Supreme Court established the standard for summary judgment as follows:
*209 [W]hen deciding a motion for summary judgment under Rule 4:46-2, the determination whether there exists a genuine issue with respect to a material fact challenged requires the motion judge to consider whether the competent evidential materials presented, when viewed in the light most favorable to the non-moving party in consideration of the applicable evidentiary standard, are sufficient to permit a rational factfinder to resolve the alleged disputed issue in favor of the non-moving party.
“The express import of the Brill decision was to ‘encourage trial courts not to refrain from granting summary judgment when the proper circumstances present themselves.’ ” Township of Howell v. Monmouth Cnty. Bd. of Taxation, 18 N.J.Tax 149, 153 (Tax 1999) (quoting Brill, supra, 142 N.J. at 541, 666 A.2d 146).
“[T]he determination [of] whether there exists a genuine issue with respect to a material fact challenged requires the motion judge to consider whether the competent evidential materials presented, when viewed in the light most favorable to the non-moving party in consideration of the applicable evidentiary standard, are sufficient to permit a rational factfinder to resolve the alleged disputed issue in favor of the non-moving party.” Ibid. at 523, 666 A.2d 146.
While certain factual issues in this case appear to be contested in some fashion, all of the material facts are not in dispute. Thus, the matter is ripe for summary judgment.
B. Standard of Review
The review of this matter begins with the presumption that determinations made by the Director are valid. See Campo Jersey, Inc. v. Director, Div. of Taxation, 390 N.J.Super. 366, 383, 915 A.2d 600 (App.Div.2007), certif. denied, 190 N.J. 395, 921 A.2d 448 (2007); L & L Oil Service, Inc. v. Director, Div. of Taxation, 340 N.J.Super. 173, 183, 773 A.2d 1220 (App.Div.2001); Atlantic City Transp. Co. v. Director, Div. of Taxation, 12 N.J. 130, 146, 95 A.2d 895 (1953). “New Jersey Courts generally defer to the interpretation that an agency gives to a statute [when] that agency is charged with enforcement.]” Koch v. Director, Div. of Taxation, 157 N.J. 1, 15, 722 A.2d 918 (1999). Determinations by the Director are afforded a presumption of correctness because “[c]ourts have recognized the Director’s expertise in the highly *210 specialized and technical area of taxation.” Aetna Burglar & Fire Alarm Co. v. Director, Div. of Taxation, 16 N.J.Tax 584, 589 (Tax 1997) (citing Metromedia, Inc. v. Director, Div. of Taxation, 97 N.J. 313, 327, 478 A.2d 742 (1984)). The Supreme Court has directed courts to accord “great respect” to the Director’s application of tax statutes, “so long as it is not plainly unreasonable.” Metromedia, supra, 97 N.J. at 327, 478 A.2d 742. See also GE Solid State, Inc. v. Director, Div. of Taxation, 132 N.J. 298, 306, 625 A.2d 468 (1993) (“Generally, courts accord substantial deference to the interpretation an agency gives to a statute that the agency is charged with enforcing.”) However, judicial deference is not absolute. An administrative agency’s interpretation that is plainly at odds with a statute will not be withheld. See Oberhand v. Director, Div. of Taxation, 193 N.J. 558, 568, 940 A.2d 1202 (2008) (citing GE Solid State, supra, 132 N.J. at 306, 625 A.2d 468); Advo, Inc. v. Director, Div. of Taxation, 25 N.J.Tax 504, 511 (Tax 2010).
C. New Jersey Corporation Business Tax Act
1. General Principles of the Act. NJ CBT requires all domestic and non-exempt foreign corporations to pay an annual franchise tax for the privilege of having or exercising its corporate franchise in New Jersey, or for the privilege of deriving receipts from sources within the State or for the privilege of engaging in contacts within the State or for the privilege of doing business, employing capital or owning capital or property, or maintaining an office in New Jersey. N.J.S.A. 54:10A-2.
New Jersey is a separate reporting state in which each entity in a corporate group that has activity in the state must file a separate corporate business tax return. If a corporation has multistate income, an apportionment factor is applied to determine the amount of its overall income subject to tax in the state. A State may tax a proportionate share of the income of a nondomieiliary corporation that carries out a particular business both inside and outside that State. Allied-Signal, Inc. v. Director, Div. of Taxation, 504 U.S. 768, 772, 112 S.Ct. 2251, 119 L.Ed.2d 533 (1992). For the year under review, New Jersey determined the *211 proportionate share of the income which is subject to the NJ CBT by applying an allocation factor which takes into account the Corporation’s in-state sales, payroll and property. See N.J.S.A. 54:10-6.[11]
Other states, such as New York, permit or require “combined reporting”, pursuant to which a related group of entities files a single return as a single taxpayer. In such jurisdictions, the income and deductions of the various members of the group are combined to determine the tax base to be apportioned to that state. Because of the single return filed in a combined reporting state, the income represented by the interest paid to the lending member of the group would be offset by the interest deduction of the borrowing member of the group, resulting in zero net income and, therefore, no tax being paid on the interest income associated ■with the loan.
Absent an add-back provision such as the one under review, interest on such related party loans may escape taxation entirely. For example, in the case before the court, MS & Co is subject to reporting in New Jersey. Without the related party interest add-back, it would deduct the interest paid to MS (and other related parties) on its New Jersey return. Since MS files a combined return in New York which includes MS & Co, the interest income received by MS from MS & Co is offset entirely by the deduction for the interest expense incurred by MS & Co and therefore, the income of MS & Co for which it received a deduction in New Jersey will entirely escape tax (assuming New York is the only jurisdiction in which MS files a return). Thus, New Jersey will have granted a deduction from otherwise taxable income in New Jersey for an amount which may not be taxed in any other jurisdiction.
Of course, it should be noted that such a result may very well occur when the Lender and the Borrower are unrelated entities. However, where the parties are related there is a potential for *212 abuse because the structuring of the transactions may be manipulated to produce just such a tax-avoidance result.
2. Related Party Interest Addr-Back Provisions of NJ CBT. To combat the abuse potential, the New Jersey legislature enacted the related party interest add-back provisions of the NJ CBT. As explained below the related party interest add-back provision essentially denies a deduction to the borrowing entity for interest paid to a related lending entity unless an exception applies.
The manner in which the add back is accomplished is in the definition of the income subject to tax in New Jersey. A corporation subject to the NJ CBT is taxed upon its Entire Net Income (ENI) which is defined in N.J.S.A. 54:10A-4(k). Specifically that section provides, in material part:
“Entire Net Income” shall mean total net income from all sources, whether within or without the United States, and shall include the gain from the employment of capital or labor, or from both combined, as well as profit gained through a sale or conversion of capital assets.
For the purposes of this act, the amount of a taxpayer’s entire net income shall be deemed prima facie to be equal in amount to the taxable income, before net operating loss deduction and special deductions, which the taxpayer is required to report ... to the United States Treasury Department for the purpose of computing its federal income tax, provided however, that in the determination of such entire net income, ...
(2) Entire net income shall be determined without the exclusion, deduction or credit of: ...
(I) Interest paid, accrued or incurred for the privilege period to a related member, as defined in section 5 of P.L.2002, c.40 (C.54:10A-4.4), except that a deduction shall be permitted to the extent that the taxpayer establishes by clear and convincing evidence, as determined by the director, that: (i) a principal purpose of the transaction giving rise to the payment of the interest was not to avoid taxes otherwise due under Title 54 of the Revised Statutes or Title 54A of the New Jersey Statutes, (ii) the interest is paid pursuant to arm’s length contracts at an arm’s length rate of interest, and (iii)(aa) the related member was subject to a tax on its net income or receipts in this State or another state or possession of the United States or in a foreign nation, (bb) a measure of the tax includes the interest received from the related member, and (cc) the rate of tax applied to the interest received by the related member is equal to or greater than a rate three percentage points less than the rate of tax applied to taxable interest by this State.
A deduction shall also be permitted if the taxpayer establishes by clear and convincing evidence, as determined by the director, that the disallowance of a deduction is unreasonable, or the taxpayer and the director agree in wilting to the application or use of an alternative method of apportionment under section 8 *213 of P.L.1945, c.162 (C.54:10A-8); nothing in this subsection shall be construed to limit or negate the director's authority to otherwise enter into agreements and compromises otherwise allowed by law.
A deduction shall also be permitted to the extent that the taxpayer establishes by a preponderance of the evidence, as determined by the director, that the interest is directly or indirectly paid, accrued or incurred to (i) a related member in a foreign nation which has in force a comprehensive income tax treaty with the United States, provided however that the taxpayer shall disclose on its return for the privilege period the name of the related member, the amount of the interest, the relevant foreign nation, and such other information as the director may prescribe or (ii) to an independent lender and the taxpayer guarantees the debt on which the interest is required.
[N.J.S.A. 54:10A-4(k)(2)(I).]
Thus, while the income subject to NJ CBT begins with federal taxable income, from which interest on all business loans has been deducted, where the loans in question are between related entities the interest paid and deducted on those loans must be added back to federal taxable income to determine ENI for NJ CBT purposes unless an exception applies. The statute works to deny the deduction for interest paid on loans between related parties otherwise allowed by the Internal Revenue Code in computing federal taxable income.
On its face the statute permits the deduction if the taxpayer demonstrates by clear and convincing evidence certain specific requirements are met, (i.e. the subject to tax exception or the guarantee exception) or that disallowance would be “unreasonable”. Each of the several exceptions are independent of the other. That is, a taxpayer may qualify for the deduction if any of the three exceptions are met and need not demonstrate qualification under all three.
3. Subject to Tax Exception. Initially, the Director reviewed the transactions presented by MS & Co and concluded that, with respect to the Makatea and Providence transactions, MS & Co failed to demonstrate that any of the interest income had been reported on the MS consolidated return and taxed in New York. (Neither Makatea nor Providence were members of the NY combined reporting group.) The Director further argued that since MS Biscay reported a net loss for the year in question it *214 had not paid tax and could not demonstrate qualification under the subject to tax exception.
With respect to the transactions between the related parties within the combined NY group, including MS Biscay, the Director argued that the interest income reported by the group was offset by the interest expense reported by MS & Co as a part of the combined group and therefore, there was a resulting zero net income. Thus, the Director concluded, the taxpayer failed to provide clear and convincing evidence that the interest income was subject to tax within 3% of its effective New Jersey tax rate to entitle it to qualify for the subject to tax exception.
It is clear that MS & Co failed to provide clear and convincing evidence that either the Makatea or Providence transactions satisfied the subject to tax exception. MS & Co provided no evidence that either of those entities were subject to tax. Similarly, with respect to any of the transactions between MS & Co and MS’ affiliates which were not members of the New York combined reporting group, MS & Co provided no evidence of any tax implications in any jurisdiction with respect to those entities. Thus, the transactions between MS & Co and Makatea, Providence and all other MS & Co affiliates not included within the MS New York combined reporting group would not satisfy the requirements of the subject to tax exception.
For the purposes of the subject to tax exception argument, the Director did not dispute that the transactions included in the NY combined group satisfied the first two requirements of the exception: that the principal purpose of the transactions was not to avoid taxes, N.J.S.A. 54:10A-4(k)(2)(I)(i), and that the transactions were arms-length, N.J.S.A. 54:10A-4(k)(2)(I)(ii). However, the Director maintained that MS & Co was unable to satisfy the three prongs of the final requirement of the subject to tax exception, N.J.S.A. 54:10A-4(k)(2)(I)(iii)(aa), (bb), and (cc).
MS & Co argued that all three prongs of the third requirement were satisfied. With respect to the first prong, N.J.S.A. 54:10A-4(k)(2)(I)(iii)(aa), MS & Co argued that notwithstanding the combined group’s net loss of more than $207,000,000, MS was “subject *215 to tax on its net income or receipts” because MS had a New York domicile and was required to file a General Business Corporation Franchise Tax Return. Further, MS & Co argued that the inclusion of the interest income by MS and its affiliates in the combined group’s income increased that income. Therefore, the interest income was included in the measure of the New York franchise tax as a result of MS being subject to tax in New York, satisfying the requirements of N.J.S.A. 54:10A-4(k)(2)(I)(iii)(bb). MS & Co further argued that the effective rate of tax paid by MS & Co was within three percent of the effective New Jersey rate as required by N.J.S.A. 54:10A-4(k)(2)(I)(iii)(cc) — even though the tax eventually imposed was a flat minimum franchise tax not calculated with reference to net income.
Even if one were to accept plaintiffs argument that MS was technically subject to tax within the meaning of the statute notwithstanding its substantial loss for the year in question, it is clear that the measure of tax imposed on the combined group did not include the interest paid by MS & Co to the group. The tax imposed was the minimum franchise tax — a tax which is not calculated with reference to the group’s income. Thus, the measure of tax imposed by New York did not include the interest received from MS & Co and the second prong of the third requirement of the subject to tax exception is not satisfied. In order to qualify for the subject to tax exception all three prongs must be satisfied. Having failed to satisfy the second prong, the exception is inapplicable and the court need not examine the manner in which plaintiff calculated the effective rate of tax.
4. The Unreasonable Exception. As noted, MS & Co could not satisfy the subject to tax exception requirements with respect to the Makatea and Providence transactions and any of the Intercompany Loan transactions with non-members of the combined group. In fact, MS & Co did not argue that the subject to tax exception was applicable to those transactions. Instead, it argued that the unreasonable exception applied with respect to these transactions. Similarly, with respect to the MS Biscay transaction, MS & Co did not rely solely upon the subject to tax exception, but argued that the facts constituting that transaction *216 qualified for the unreasonable exception. Further, while MS & Co argued that it was entitled to deduct the interest paid to MS and the members of the NY combined group under the subject to tax exception, it also argued that those transactions were such that it would be unreasonable to deny the deductions. In support of this position MS & Co supplied substantial documentary evidence,
a. Principles of Statutory Construction.
In order to assess the validity of MS & Co’s position, the court must first discern the meaning of the unreasonable exception to the add-back provision.
The construction of a statute begins with an analysis of its plain language. Merin v. Maglaki, 126 N.J. 430, 434, 599 A.2d 1256 (1992). “[T]he goal is to divine and effectuate the Legislature’s intent.” State v. Shelley, 205 N.J. 320, 323, 15 A.3d 818 (2011). “[T]he best approach to the meaning of a tax statute is to give the words used by the Legislature their generally accepted meaning, unless another or different meaning is expressly indicated”. Public Service Elec. & Gas Co. v. Woodbridge Twp., 73 N.J. 474, 478, 375 A.2d 1165 (1977). “In the absence of any explicit indication of special meaning, words of a statute are to be given their ordinary and well understood meaning.” Levin v. Parsippany-Troy Hills, 82 N.J. 174, 182, 411 A.2d 704 (1980). “When the Legislature’s chosen words lead to one clear and unambiguous result, the interpretative process comes to a close, without the need to consider extrinsic aids.” Shelley, supra, 205 N.J. at 323, 15 A.3d 818.
Black’s Law Dictionary (7th ed.) provides that the meaning of the word “unreasonable” is “not guided by reason; irrational or capricious” Black’s Law Dictionary (7th ed.). “Reasonable” is defined as “fair, proper, or moderate under the circumstances”, Id., and “within the bounds of common sense”. Webster II New Riverside University Dictionary (1988). Unreasonable is defined as “not governed by reason” or “going beyond reasonable limits”, Id.
Both the Director and MS & Co contend that the plain meaning of the unreasonable exception supports their diametrically op *217 posed positions. Plaintiff contends that it is unreasonable to deny an interest deduction when a transaction has a valid non-tax business purpose and economic substance irrespective of the identity of the parties. The Director contends that such an interpretation is itself unreasonable because it would create a very large loophole in a statute designed to close that very loophole.
A statutory enactment cannot be deemed as a meaningless exercise by our Legislature and must be interpreted to have some purpose. See Flexx Petroleum Corp. v. Director, Div. of Taxation, 12 N.J.Tax 1, 12 (Tax 1991) (court must avoid any interpretation “that will render any part of a statute inoperative, superfluous or meaningless” or “attribute to the Legislature a deliberate attempt to make a meaningless change”) (internal quotations omitted). If the language yields more than one plausible interpretation, extrinsic evidence such as legislative history can be considered. Shelley, supra, 205 N.J. at 323, 15 A.3d 818.
b. Legislative History of the Addr-Back Provision.
The interest add-back provision was adopted as part of the Business Tax Reform Act of 2002 (“BTRA”). The Senate Budget and Appropriations Committee Statement to Senate Bill 1556 (2002) states:
“Loophole Closers” and Tax Base Changes.
Revenue from the corporation business tax (CBT), the State’s main income-measured business tax, have been declining in the face of apparent economic expansion. There is evidence that large corporations with apparently substantial economic activity in this State and substantial profit have managed to avoid taxation of this income by New Jersey. Some large and seemingly expanding corporations have managed to avoid having any taxable income at all. New Jersey’s experience is part of a national trend, especially in so-called “separate entity” states like New Jersey, where each corporate entity within an affiliated group computes its tax separately, and corporations may structure transactions between affiliates in various states to avoid tax. Effective corporate tax rates in the states fell during and despite the economic expansion of the 1990’s.
The “loophole closers” address various ways in which corporations reduce or avoid tax on income, restoring equity between the corporations that can use these methods and those that cannot or do not. The bill also makes a number of changes to the tax base that increase the taxation equity between corporations that have different organizational forms, but engage in economically similar businesses.
[The Senate Budget and Appropriations Comm. Statement to Senate Bill 1556 (2002)]
*218 In addressing specifically the “loophole closer” of related interest deductions, the Statement provides:
The bill also restricts deductibility of inter-affiliate interest expenses. However, the bill would again allow such deductions as exceptions in areas that are established as “non-tax avoidance” situations.
The first exception is intended to avoid unfairly duplicative taxation, and sets the following criteria for determining whether such a situation exists: (1) the principal purpose of the transaction was not to avoid taxes; (2) the interest was paid at an arm’s length rate pursuant to an arm's length contract; and (3) the transaction was already subject to tax at levels approximating that of New Jersey’s corporation business tax.
The second exception is permitted when the taxpayer establishes that the disallowance of the deduction is unreasonable. As with the similar provision for intangible costs, the disallowance is unreasonable if it would violate the policy goals of the disallowance. For example, the bill permits a taxpayer to keep the deduction if the interest paid is ultimately paid to a third-party unrelated lender, as evidenced by a guarantee provided by the taxpayer to the outside lender. If a taxpayer can demonstrate that, despite the absence of a guarantee, interest is being paid on a loan that was simply “pushed down” from a third party lender, than it would be unreasonable to disallow the interest deduction.

[Ibid.]

The example in the Committee Statement quoted above is instructive. The guarantee exception of the statute permits a deduction for interest on loans between related parties that are initiated through a third party lender, provided the taxpayer guarantees payment of the loan to that third party lender. In such a case, the loan is essentially between the taxpayer and the third party lender, with the related party simply a conduit for the loan for business purposes. While the statute would require the existence of a guarantee to qualify for the exception, the example explaining the unreasonable exception clarifies that if, for all intents and purposes, the loan is between the taxpayer and the third party lender — because of the “push down” — it would be unreasonable to disallow the deduction because the related party aspects are essentially eliminated.
e. The Unreasonable Exception Requires More Than Business Purpose and Economic Substance.
MS & Co maintains that the policy goal referred to in the Senate statement is solely the non-tax business purpose coupled with economic substance. For the following reasons, the court *219 finds that this position is not supported by the plain language of the statute.
The starting point for determining ENI is federal taxable income, from which ordinary and necessary business expenses, including related party interest, have been deducted. The related party add-back provision specifically requires that such ordinary and necessary expenses be treated in a different manner if such expenses exist between related parties. Therefore, the unreasonable exception must be interpreted as requiring more than a valid non-tax business purpose and economic substance or the exception would swallow the rule.
This is evident from the wording of the first exception — the subject to tax exception — which requires as a prerequisite to qualification, that the taxpayer demonstrate by clear and convincing evidence that the principal purpose of the transaction was not to avoid taxes (i.e. business purpose). N.J.S.A. 54:10A-4(k)(2)(I)(i). In addition, the transaction must meet arm’s length requirements (i.e. economic substance). N.J.S.A. 54:10A-4(k)(2)(I)(ii). Finally the interest must be subject to tax in another jurisdiction. N.J.S.A. 54:10A-4(k)(2)(I)(iii). Had the Legislature intended that the exception be applicable to all related party transactions that had non-tax avoidance business purpose and economic substance, the need to demonstrate that tax was paid in some jurisdiction would be unnecessary. Clearly, the Legislature required something more than a valid non-tax business purpose and economic substance be demonstrated in order to qualify for the exception.
The unreasonable exception should be similarly read; that is, that something more than a valid non-tax business purpose and economic substance need be demonstrated in proving the “unreasonableness” of the interest add-back. Tó do otherwise would be to completely disregard the statute’s disallowance of the interest deduction for transactions between related parties.
It is clear that the State does not need N.J.S.A. 54:10A-4(k)(2)(I) to disallow interest deductions for loans that lack a business purpose and/or are motivated by tax avoidance. Since *220 N.J.S.A. 54:10A-4(k) requires that a taxpayer begin its calculation of ENI with taxable income required to be reported to the federal government, by definition all deductions must be “ordinary and necessary expenses paid or incurred during the taxable year in carrying on any trade or business”. 26 U.S.C. § 162(a). Thus, any deduction that does not reflect a valid business purpose would not be deductible in arriving at federal taxable income and ENI. Accepting plaintiffs position would relegate N.J.S.A. 54:10A-(4)(k)(2)(I) to an unnecessary reiteration of N.J.S.A. 54:10A-4(k).
Similarly, the application of the unreasonable exception cannot be meant to apply only to situations where the Director demonstrates that the transaction is a sham. If the deduction represented a sham under federal income tax concepts it would not be a valid deduction in calculating federal taxable income and would not be subject to being added back. Gregory v. Helvering, 293 U.S. 465 (1935), 55 S.Ct. 266, 79 L.Ed. 596; 26 U.S.C. 7701(o). As noted by the Alabama Court of Civil Appeals[12] when it reviewed a similar add-back provision for royalty payments between related parties, it seems unlikely that a legislature would find it necessary to address sham transactions through the use of an “add-back” provision. Surtees v. VFJ Ventures, Inc., 8 So.3d 950, 969-70 (Ala. Civ. App. 2008), aff'd, Ex Parte VFJ Ventures, Inc., 8 So.3d 983 (Ala.2008).
The court finds that in enacting N.J.S.A. 54:10-4(k) the Legislature intended that something more than a valid non-tax business purpose and economic substance must be demonstrated to qualify for the unreasonable exception: unfair duplicative taxation; a technical failure to qualify the transactions under the statutory exceptions; an inability or impediment to meet the requirements due to legal or financial constraints; an unconstitutional result; a demonstration that the transaction for all intents and purposes is an unrelated loan transaction.[13]
*221 The court expressly rejects the plaintiffs position that a related party transaction which has a valid non-tax business motive and economic purpose, without more, would qualify the transaction for the deduction. Such a position disregards the Legislature’s decision to deny the deduction to related party transactions in the first place and would render the statutory provision disallowing the deduction meaningless. See Flexx Petroleum Corp v. Director, Div. of Taxation, supra, 12 N.J.Tax 1.
d. Beneficial Decision
Further, plaintiffs reliance on this Court’s ruling in the unpublished decision in Beneficial New Jersey v. Director, Div. of Taxation No. 009886-2007, 2010 WL 10129134 (Tax Aug. 31, 2010) to support the position that only a non-tax business purpose and economic substance need be demonstrated is misplaced.[14] In Beneficial, the plaintiff corporation was unable to show that the interest paid in any one jurisdiction was subject to tax at the necessary effective tax rate required to satisfy the subject to tax exception of N.J.S.A. 54:10A-4(k)(2)(I). Nonetheless, the court found that the taxpayer was entitled to the unreasonable exception under the “totality of the circumstances” shown in that case. The combination of facts demonstrated by the taxpayer in Beneficial led the court to conclude the transactions under review presented the kind of situation contemplated by the drafters of the unreasonable exception. Among the facts considered by Judge Hayser were the practice of the corporate parent to obtain the funds to loan to the subsidiary because of its superior credit rating and ability to obtain favorable rates, and that the parent corporation paid tax on the interest income in seventeen jurisdictions. The court specifically found that determining the applicability of the unreasonable exception is a case by ease determination, heavily dependent on the facts of each such case.
That position is echoed in the Director’s Technical Advise Memorandum TAM-2011-13. In that document, the Director sets forth several examples pursuant to which the Division will recog *222 nize the application of the unreasonable exception to the related party interest add-back provision.
The first example is where the taxpayer has both a payable and a receivable from the exact same related party. In that ease, only the excess interest expense is subject to being added back.[15] The second example is where there is a “cash sweep” cash management arrangement between the related parties. This arrangement is defined in the example as a situation where one related party is responsible for the payment of all of the cash activities of the group. All cash is automatically swept in to the bank account of the manager, who pays all the expenses of the group, and the cash balances are accounted for by intercompany receivables and payables. All cash must be handled through the cash sweep structure and the cash manager must make a profit on the transaction, in order to qualify for the exception.
Finally, the third example recognizes the holding in Beneficial, stating:
The court found there was economic substance because Beneficial of New Jersey’s parent, HSBC, borrowed money and then loaned borrowed funds to its subsidiaries, which included Beneficial of New Jersey, as HSBC received more favorable interest rates than could the subsidiaries as independent borrowers. The money that HSBC boiTowed was loaned to subsidiaries other than HSBC. HSBC paid taxes on income including BNJ’s interest payments, in seventeen jurisdictions. The court found that, under this set of circumstances, it would be unreasonable to add back the interest deductions. The court also stated that its decision to apply the “unreasonable” exception in this case “in no way creates a general rule applicability (sic).” Thus, such decisions will be made on a case by case basis, based on the totality of the circumstances.
[TAM-2011-13 (Emphasis added).]
e. Director’s Interpretations Misapplied
As noted MS & Co, in applying for a refund of tax for the related party interest, maintained that the transactions qualified for the unreasonable exception. MS & Co provided substantial *223 documentation for the Division’s review to support its position. The Director asserted that all of the facts and circumstances applicable to MS & Co’s transactions with the related parties were reviewed and that there was a determination that those transactions did not qualify for the unreasonable exception. In support of its assertion, the Director stated that the material relevant facts considered in denying the application of the unreasonable exception were: (1) MS & Co is a New Jersey taxpayer with significant income in New Jersey; (2) MS & Co paid interest income to MS which filed returns in New York; (3) through intercompany transactions, there is a wash/net loss shown on MS’s New York return; and (4) no tax was paid on the income of MS in New York.
While the Director maintains all of the facts and circumstances of the several transactions were reviewed, the only fact referenced to support the determination that the taxpayer did not qualify for the unreasonable exception was its failure to demonstrate that a tax had been paid on the interest income. Plaintiff went to great lengths to provide certifications and documents in an attempt to demonstrate that the transactions under review were similar to several of the types of transactions sanctioned in TAM-2011-13. The Director did not argue that the facts submitted by plaintiff were insufficient to qualify as a cash management agreement, a third party loan or any of the other qualifying transactions. Instead the Director maintained that it “would be contrary to the plain meaning of the statute to allow the deduction when Plaintiff has failed to determine by clear and convincing evidence that the income on the debt in question was taxed at all in any other jurisdiction.”
Thus, while acknowledging that the application of the unreasonable exception analysis is “fact-sensitive”, it appears clear that the Director failed to examine the facts of any of the cited transactions to determine if they presented facts and circumstances supporting an unreasonable exception. Once the Director determined that the facts did not support a conclusion that a tax was paid on the interest income, the examination ended.
*224 A plain reading of the statute makes it clear that a demonstration that a tax be paid is not required for a qualification under the unreasonable exception. The unreasonable exception follows the subject to tax exception which requires that a related member be subject to tax on its net income and that a measure of the tax include the interest received from the related member. Thereafter, the statute provides, “A deduction shall also be permitted if the taxpayer establishes ... that the disallowance of a deduction is unreasonable ...” (Emphasis added.) Since the unreasonable exception follows a provision clearly requiring the demonstration of the payment of tax, it seems unlikely that the Legislature intended the unreasonable exception to include a similar requirement, but neglected to include such language.
Furthermore, a requirement that a taxpayer demonstrate that the income on the debt in question was taxed in some other jurisdiction is not a determinative factor adopted by the Director in TAM-2011-13. TAM-2011-13 does not require the payment of tax as a requirement for qualification under the netting or cash sweep examples and is only one of the factors considered in the Beneficial decision discussion. It is clearly not referenced as the determinative factor.
Had the Director reviewed the facts and circumstances of the various transactions and argued those facts before this court, it may very well be that a determination may have been made that those facts and circumstances did not support a deduction. Instead, the Director argued that because the taxpayer failed to show that tax was eventually paid on the interest income remitted to the related parties, the unreasonable exception inquiry was over. Neither the plain language of the statute, nor the legislature history explaining the unreasonable exception, lead to such a result.
Interestingly, Special Adoption of Regulations addressing N.J.A.C. 18:7-5.18 provides:
The interest add back exceptions from N.J.S.A. 54:10A-4(k)(2)I are the basis for N.J.A.C. 18:7-5.18(a). The first exception, at paragraph (a)l relates to the situation where a party related to the taxpayer pays a tax equal to or greater than a rate of three percentage points less than the rate of tax applied to taxable *225 interest in New Jersey. In instances where the recipient of the interest income is losing money (and therefore pays no tax) the taxpayer would have to qualify under a different exception in order to be able to deduct the interest expense. [35 N.J. Reg. 1573(a) (Emphasis added).]
Thus, it is anticipated that a payment of tax need not be demonstrated in qualifying under “a different exception”.
Furthermore, the final regulation adopted by the Director with reference to the subject to tax exception specifically indicates that a tax need not be “actually paid on the related member” for the subject to tax exception to apply. (See N.J.A.C. 18:7-5.18(a)(1)(iii)). Thus, the requirement that a tax be paid to qualify for the unreasonable exception is at the very least contradictory to the Director’s own guidance and final regulations.[16]
In limiting the inquiry solely to the question of whether tax was paid in a jurisdiction, the Director abused his discretion by failing to take into account even his own regulations and informational statement of the law, which clearly demonstrate that the sole criteria is not the payment of tax.
While courts generally accord administrative agencies deference in their interpretation of statutes which they are charged with enforcing, that agency may not, under the guise of interpretation, extend a statute to give it a greater effect than its language permits. GE Solid State, supra, 132 N.J. at 306, 625 A.2d 468 (citing Hawthorne Fabrics Inc., 41 N.J. 521, 528, 197 A.2d 673 (1964)).
The Director’s position making the payment of tax as a defacto requirement for the unreasonable exception would extend the *226 statute beyond that which was contemplated by the legislature. The requirement that the unreasonable exception be denied when a taxpayer fails to demonstrate that a tax has been paid runs contrary to the intent of the statutory exception, the Division’s own regulations and published guidance which allow the application of the unreasonable exception in cases where no tax has been paid.
III. Conclusion
As the Director evaluated the plaintiffs transactions under criteria that is contrary to the statute, regulations and published guidance, the court is left with little choice but to find that the Director acted unreasonably when it reviewed MS & Co’s interest add-back transactions under the unreasonable exception.
Further, as the court has found that the Director has acted unreasonably in the application of the unreasonable exception, the court will not independently evaluate the merits of the underlying transactions nor reach the issue of constitutionality argued by the plaintiff.
MS & Co’s Motion for Summary Judgment is granted. The Director’s Cross-Motion for Summary Judgment is denied. Judgment will be entered accordingly.

The Director did not argue that the classification of the premium paid as interest was improper and the court makes no findings on that issue.

 Financial Institution B purchased $950,000,000 of preferred stock with a guaranteed dividend payable every six months and $50,000,000 of preferred stock with dividends payable at the discretion of the Board of Directors of Makatea.

 Plaintiff did not provide the source of $2,000,000 of the $1,502,000,000 which was borrowed by MS & CO in this transaction.

 The steps set forth are a "simplified" version of the actual transactions, but are sufficient to describe the events for the purposes of this discussion.

 The Director did not argue that the classification of the difference between the amounts paid in this scenario was improperly classified as interest and the court makes no findings on that issue.

 While it appears that MS & Co may have filed returns in several jurisdictions including New York State, plaintiff did not provide any information or documentation regarding tax filings in any jurisdiction other than New York State. No information regarding returns filed or taxes paid in any jurisdiction was provided with respect to either Makatea or Providence or any other entity not included in the combined group to whom MS & Co paid interest.

 Actual Federal Corporate returns were not provided for MS, individually or on a consolidated basis with any of its related entities, nor was any federal return submitted for MS & Co individually. Pro forma Federal Returns for MS, both on a consolidated basis and on an individual basis were submitted. The pro forma Federal tax return for MS and its related entities on a consolidated basis was utilized in completing the NY Return.

 34.2939% is the “allocated combined business income" percentage as calculated on the NY Return. The Director contends the correct allocation factor is 23.2272% which was reported on the NY Return as the "combined issuer's *207 allocation percentage”. Neither factor was applied in calculating the New York tax due because MS paid only the minimum flat tax of $1,500.00 and the apportionment factor was not material to the calculation of the tax due to the State of New York.

 No information regarding the source of any of the credits was provided.

 Although MS & Co's complaint initially contested the methodology of calculating the interest add-back utilized by the Director, it was not part of the Motion and is deemed abandoned.

 The CBT apportionment factor changed as a result of legislative action in 2011. The formula will convert to a single sales fraction formula following a three-year phase in which began January, 2012. L. 2011, c. 59, § 1.

 The opinion was adopted in its entirety by the Alabama Supreme Court.

 This list is by no means intended to be exhaustive.

 As an unreported case, the Beneficial decision has no precedential value.

 It appears that this example may have formed the basis for the netting process utilized by MS & Co in reporting related party interest on its initial return. As neither party argued the propriety of utilizing such a method in reporting the related party interest add-back in this matter, the court makes no finding on the issue.

 The court recognizes that Example 5 of regulation, N.J.A.C. § 18:7-5.18(a) denies deductibility where a combined return is filed by a lender in a related party loan transaction. The example states: “While the interest income is, in fact, included as a tax determinate in State X, so is the interest deduction. The apportionment factors are not affected. As a result, NJ loses revenue, the State X result is neutral, and the taxpayer gets a windfall. The reform act was intended to address this type of situation. Thus, the interest expense must be taxed in a non-unitary (sic) state for one of the exceptions to apply." The court rejects that position as not in accord with the statute and the legislative history, neither of which indicates that a tax must be paid in order to qualify for the unreasonable exception.