NOT FOR PUBLICATION WITHOUT APPROVAL OF
THE TAX COURT COMMITTEE ON OPINIONS

TAX COURT OF NEW JERSEY
DOCKET NO.  000403-2012

BMC SOFTWARE, INC., successor by merger  :
to BMC SOFTWARE DISTRIBUTION, INC.  :

           :

     Plaintiff,        :

           :

     v.           :

           :

DIRECTOR, DIVISION OF TAXATION,  :

           :

     Defendant.     :

           :

> Approved for Publication
> In the New Jersey
> Tax Court Reports

Decided:  **May 24, 2017**

Michael A. Guariglia and David J. Shipley for plaintiff
(McCarter & English, L.L.P., attorneys).

Michael J. Duffy for defendant
(Christopher S. Porrino, Attorney General of New Jersey, attorney).

Sundar, J.T.C.

This opinion addresses the parties' respective summary judgment motions centering primarily around defendant's refusal to exclude amounts paid as intangible expenses by a subsidiary to its parent from being added back to the subsidiary's income under N.J.S.A. 54:10A-4.4(b).  Plaintiff contends that the addback provisions do not apply because despite the expense being termed as "royalty," the subsidiary's payment was, in actuality, the purchase price of software for retail sale akin to cost of goods.  Alternatively, it argues, should the court deem the subsidiary's payment (and corresponding deduction) as "royalty," then the payment qualifies for an exception to the addback because the payment was crucial to the subsidiary's ability to earn income, was similar to payments made to unrelated third parties under similar agreements, and the

\*

related member payments were not for tax avoidance. Plaintiff also contests defendant's (1) throwout of certain receipts from the denominator of the apportionment fraction, and (2) imposition of underpayment and amnesty penalties. Defendant ("Taxation") refutes each such contention.

For the reasons stated below, the court concludes that the plain language and substance of the agreement between the related members show that payments were made by the subsidiary for obtaining the license to use and distribute the parent's prewritten software, original and updates thereto, a proprietary product. Therefore, the subsidiary's payments qualified as an intangible expense/cost for purposes of addback provisions of N.J.S.A. 54:10A-4.4.

However, the court finds that payments are excepted from the addback statute because the undisputed facts in this case show that the payments were substantively equivalent to payments made by either the parent or the subsidiary to unrelated third parties under transactions involving the same subject and object (sale of prewritten computer software license and service contracts). Thus, denying a deduction for such payments is "unreasonable" under N.J.S.A. 54:10A-4.4(c)(1). The court's finding on this issue would result in no additional tax due thus, renders the parties' argument on the validity of the imposed penalties moot. Both parties' summary judgment motions as to the subsidiary's apportionment factor are denied since facts in this regard are undeveloped.

**FACTS**

*(A) Background*

Plaintiff, BMC Software, Inc. ("Parent") is a Delaware company headquartered in Texas. It does business in New Jersey, in addition to several other States. It has offices in 16 States and about 2,500 employees nation-wide. Its principal business is to create and develop computer software programs (called the source code), which it protects as intellectual property, along with its logos and trademarks. It also markets its prewritten software to primarily large (Fortune 500)

2

businesses under the name "BMC Software," "Patrol Software," or other trademarks. The prewritten software is transferred for use of the customer (who is the end user) through media such as magnetic tapes or CD-ROMs, or electronic downloads. This means that the source code plus the program features, which are on Parent's computers, are burned onto a CD or magnetic tape, which would then be packaged and shipped with appropriate paperwork and instructions to an end-user. Parent granted licenses to related and unrelated third parties to use/transfer its prewritten software to end users.

Plaintiff BMC Distribution Inc. ("Subsidiary") was a Delaware company incorporated in April 1996, headquartered in Texas, and 100% owned by Parent. Subsidiary had offices in 15 States and over 1,000 employees nation-wide. In 2008, it merged with Parent which became the successor in the merger.

On April 1, 2002, Parent and Subsidiary entered into a 5-year licensing agreement (hereinafter "Parent-Subsidiary License Agreement"), which was renewable annually. The Agreement granted Subsidiary a "non-exclusive right . . . to license, market and distribute" Parent's prewritten software as existing or as modified in the future, for use by Subsidiary's customers worldwide except in 34 specified countries. Parent also granted Subsidiary a non-exclusive right and license in all of Parent's intellectual property rights in those computer products but only to the extent necessary and within the parameters of the Parent-Subsidiary License Agreement. Parent further granted Subsidiary a non-exclusive right and license to use Parent's tradenames and trademarks "only in connection with the distribution, licensing and marketing" of its computer products "and only in association" with such products. Any resulting goodwill inured to the benefit of Parent.

Subsidiary could "access and use all pertinent aspects" of the Parent's intellectual property rights in the computer products such as "information, knowledge and technical intelligence" as necessary to help Subsidiary "license, market, distribute, support, maintain and provide technical service" to Subsidiary's customers. It was entitled to "possess magnetic tapes or other" digital media containing the prewritten software and could duplicate the same for its end users. It had the right to address issues of warranty, indemnification, and other contractual rights attendant with the further licensing and distribution of Parent's computer products. It also had the right to provide "support, maintenance and enhancements" to its customers (such as code corrections, technical support, supply updated products or enhancements). Parent could impose "reasonable charges" upon Subsidiary for "the goods supplied or the services rendered" in this regard.

Subsidiary had to pay 55% of its "gross license and maintenance revenue" as "royalty for each Product" it licensed in consideration for the Parent's grant of rights and licenses.

Parent had the right to control all aspects of Subsidiary's business to ensure that the products were "being distributed, licensed and marketed" in accordance with Parent's instructions and policies. Parent remained owner of all intellectual property (contract rights, copyrights, trademarks, patents, tradenames, etc.) at all times. While Subsidiary could not sub-license, sell, or assign the Parent-Subsidiary License Agreement without Parent's consent, Parent could do so freely, including transferring or encumbering Parent's "right to receive royalties from" Subsidiary.

Upon expiration of the Parent-Subsidiary License Agreement, the end users' rights and obligations under licenses granted by Subsidiary reverted to Parent. Upon expiration or termination of the Parent-Subsidiary License Agreement, Subsidiary had to cease distribution, licensing, and marketing activities, and return all computer products to Parent. However, unfulfilled or continuing obligations remained in effect.

4

The Parent-Subsidiary License Agreement required Subsidiary to use Parent's pre-approved "Software License Agreement," when entering into contracts with Subsidiary's customers. The sample "Technology Solutions Agreement" (or "TSA") contained the general terms required between Subsidiary and its customer, which governed the customer's "purchases . . . of licenses for software products" and for related services (collectively called "BMC Technology"). The customer end user had to also execute one or more addenda, which reiterated that it was buying "licenses for software products . . . and related support services." The TSA plus the addenda gave the customer a "non-exclusive, non-transferable, [mostly] perpetual . . . license to" install and operate the software only for the customer's own business needs, and "make one copy" as a backup. The customer could not redistribute the software (by rent, lease, sublicense, or other means), nor modify the product. All rights of, or title to, any such software and accompanying intellectual property rights remained with Subsidiary or its affiliates or the Parent. Once the TSA period ended, the customer was to uninstall and cease use of BMC Technology, and if requested, return any copies of the same (or certify that the unreturned copies were destroyed) so that Parent's intellectual rights in the prewritten software were protected.

Subsidiary was primarily engaged in sales and marketing of Parent's products. It did not undertake research and development ("R&D"). Parent established retail prices for the prewritten software. Installation and training services were provided by another subsidiary called Software Services, Inc. Subsidiary did not have any domestic distribution center or network since Parent shipped copies of the prewritten software and attendant paperwork to Subsidiary's customers. Without the license agreement, Subsidiary could not market/distribute Parent's software.

On April 26, 2002 (thus, within a month of execution of the Parent-Subsidiary License Agreement), an economic consulting firm was "asked to determine an arm's length royalty rate"

5

in connection with the "intercompany royalty paid by" Subsidiary to Parent. The firm noted that per the Agreement, Subsidiary only licensed and distributed BMC products since Parent performed the "product manufacturing," maintenance, and/or support services. The firm opined the 50%-55% royalties paid to Parent by third-party distributors in foreign territories supported the 55% rate paid by Subsidiary. However, since those agreements covered "smaller, less developed markets," as opposed to North America, the firm also analyzed 47 computer software wholesale distributors in the United States and eliminated 32 as being non-comparable to Subsidiary (functionally, by having high research and development, less than 3 years of data). It then computed a range of operating profit margin for those companies after adjusting for factors affecting profit (receivables/payables; level of inventory holding) to conclude that 2% over three years was a reasonable profit margin. This when applied to Subsidiary's forecasted sales and expense data, implied a 56.9% royalty rate. The firm recommended "implementing a royalty rate of 55%" since it was consistent with Parent's third-party foreign agreements and with the "implied royalty" using profit margins of "comparable" national computer software wholesale distributors.

Plaintiff provided seven sample contracts to evidence similar licensing contracts with unrelated third parties. One contract called the "marketzone marketing alliance agreement" was between a third party and Subsidiary whereby each party permitted the other a "personal, non-exclusive, non-transferable and restricted license" to use each other's trademarks, with ownership of the same remaining in each party or their related licensors. Payment was by way of a membership fee in "BMC's Marketzone Marketing Alliance Program," and varied depending on the type of membership ($5,000 if "advanced" or $26,000 if "premier"). In a supplemental agreement, the third party granted Subsidiary "the right and license" to do anything necessary with the third party's software, including "copying and using" them for various purposes (develop, test,

6

maintain, integrate into existing BMC products, market, distribute, and license/sub-license), on a "worldwide basis." Subsidiary retained full control of the manner in which the products would be marketed, distributed, priced, and licensed (whether or not in conjunction with an existing BMC product). Subsidiary had to pay "royalties" of 40% of net invoice amount for licensing plus 70% of the net invoiced fees for support services.

The other six sample contracts were termed either as "Marketzone Single Sale Reseller," "Marketzone Direct," or "Marketzone Direct Sublicense" agreements, and were between Parent and an unrelated third party. Those contracts granted Parent a "non-exclusive right and license on a worldwide basis" to distribute and market the third party's software products, with Parent having full control on marketing process. Ownership and title to the software license remained with the third party, and to the extent integrated with BMC products, Parent retained ownership and title to the same. An escrow agreement was also part of the transaction whereby the intellectual property, such as the source code, and all proprietary and confidential information were kept in escrow with an independent escrow agent. In all agreements, Parent had to pay "fees," to the third party, which were computed at a percentage of the net invoiced amount, with different rates for "license fees" and for "support fees."[1] In the "Marketzone Single Sale Reseller" agreement, the Parent was to negotiate a sale of the third party's product, accept a purchase order, invoice the customer, and remit the payment less Parent's "fees." The third party was responsible for fulfilling the purchase

---

[1] If the contract was silent, the fees payable to Parent were 60% of the net invoice for software that provided a "perpetual license," or 50% if the license was for a "term;" 60% for hardware sold but 50% if leased; and 20% for services. The sample contracts showed that the "license fee" ranged between 40% to 50%, and the "support fees" ranged between 60% to 80%.

One of the sample contracts was called "Remedy/… Reseller" agreement, which was between Parent (named as "Remedy" in the contract) and a German company. The payment due by Parent was termed as "royalty," which was payable at 35% to 50% of the "current Remedy list price" depending on the number of the software licensed copies sold. For support contracts sold, Parent had to pay 9% of the list price (or 4.5% if sold indirectly) to the German company.

order (i.e., shipping the products to an end user F.O.B.), for "all software license management," and support/maintenance obligations.

The Forms 10-K filed with the SEC by Parent (for the entire group including all the subsidiaries, hereinafter "BMC") for the tax years at issue here, stated that the BMC's "software solutions" are "licensed under multiple license types," which can be either "perpetual" or for a term certain. Revenue comprised of three categories: product license fees, support/maintenance fees, and fees for professional services. The "sale of" the "software licenses, software maintenance and professional services" formed the "primary source of cash." "License revenues" are the "fees for the use of [BMC's] software products licensed under . . . agreements." License agreements "under which customers use [BMC's] products restrict the customer's use to its own operations and prohibit disclosure to third persons." Agents, distributors, and resellers, or system integrators (collectively called "channel partners") which indirectly marketed/distributed BMC's products and services, "act[ed] as the principals in the transactions with the end users," and were deemed owners (i.e., risk of loss and title passed to them), upon BMC's "execution of . . . arrangements with" and "delivery of . . . products" to them. Those channel partners have no right to return or price protection.

*(B) Parent and Subsidiary's CBT Returns*

Both Parent and Subsidiary used a fiscal year ending ("FYE") as the reporting period. For FYsE 2005 to 2008, the tax years at issue here, Parent reported royalty income of $573,175,946; $562,585,767; $699,748,938; and $779,838,391 on its CBT returns. The returns do not identify specifically the amounts received from Subsidiary. For each tax year, Parent's allocation factor (combined property, payroll, and receipts) was 0.54%; 0.27%; 0.40%; and 0.25%. Except for FYE 2007, Parent reported $0 as receipts from sales of either tangible personal property or services, and

8

only reported amounts received as royalties on Schedule J (explicating the sales allocation factor). For FYE 2007, it reported $0 as receipts from royalties and about $29 million as receipts from sales of tangible personal property shipped to points within New Jersey.[2]

For each year, Parent reported a positive income before deductions for net operating losses ("NOLs") and/or dividend exclusions. Parent had prior years' NOLs of $199,709,818; $139,047,340; and $135,069,522 (for FYsE 2002, 2003, and 2004), totaling $473,826,680. For each tax year, the NOLs and dividend income exclusions netted out the positive income, thus Parent's entire net income ("ENI") was $0. Since it fully used the prior years' NOLs as of FYE 2009, it reported a positive ENI for FYE 2010.

For the same tax years, Subsidiary reported a positive ENI, and $0 as "cost of goods sold" ("COGS").[3] For each year, it deducted $423,701,984; $459,480,902; $468,074,638; and $491,965,142 as "management fee expenses." On Schedule G, Part II, under the column titled "Type of Intangible Expense Deducted," it reported the payments made to Parent as "royalty" in the amounts of $253,114,708 (FYE 2005); $288,199,717 (FYE 2006); $417,965,826 (FYE 2007); and $491,965,142 (FYE 2008).[4] It then claimed a portion of the same as being an exception to the addback since Parent had included the said amounts in Parent's ENI. In computing such portion,

---

[2] This was the same manner of reporting for FYE 2004 (not at issue here). For FYsE 2002 and 2003 (not at issue here) Parent reported receipts allocable to New Jersey in the "total" column, without breaking down the receipts (either to sales from tangible personal property or royalties) on Schedule J. However, for these two tax years it reported gross royalties on Schedule A in computing its ENI.

[3] Subsidiary's returns for prior tax years (FYsE 2002; 2003; 2004) also showed $0 as COGS.

[4] Except for FYE 2008, Subsidiary included royalties it paid to two related members in a foreign country which had a treaty, and excluded those entire amounts as exceptions to the addback on Schedule G-2, Part II. Parent did the same on Parent's CBT returns as to the same related members (except for FYE 2008). The "management fee expense" deduction on Schedule A was not the exact amount as the "royalty" paid on Schedule G for FYE 2005 ($423,701,984 versus $423,713,701) and FYE 2007 ($468,074,638 versus $466,630,326), however, was the same amounts for FYE 2006 and FYE 2008. For FYE 2003 (not at issue here), Subsidiary reported $0 on Schedule G. For FYE 2004 (also not at issue here), it reported $410,914,873 as royalties paid to Parent and added back $0 (since portion of the royalties was paid by Parent to foreign subsidiaries and the remaining was "included" by Parent as Parent's ENI, noting that at 9% on royalty income "sourced to New Jersey" Parent's CBT was $43,313).

9

Subsidiary reported that Parent's ENI (for each year) was the exact amount of the royalty paid, although Parent had reported $0 as its ENI for that reporting period. Using certain computations to the royalty amount allocable to New Jersey, Subsidiary deducted (i.e., claimed an exception to the addback) the majority of the royalty paid, and added back only a portion of the same. For each tax year, the amounts deducted (i.e., claimed as an exception to the addback) were $225,157,647; $192,392,385; $334,085,910; and $369,124,636. Thus, for each tax period, Subsidiary added back royalty paid in the amounts of $27,956,431; $95,807,332; $83,879,916; and $122,840,506.

Subsidiary's allocation factor (combined property, payroll, and receipts) was 0.061%; 0.041%; 0.051%; and 0.034%. For each tax year, it reported $0 as receipts from royalties on Schedule J (explicating the sales allocation factor). Instead, all receipts allocable to New Jersey were from sales of tangible personal property shipped to points within New Jersey.[5] In the denominator portion of the receipts fraction (i.e., the "everywhere" receipts) it deducted certain amounts as "non-sourced receipts" for each tax year.[6]

*(C) Taxation's Audit*

By notice of August 20, 2010, Taxation issued a Notice of Assessment disallowing the exception to the addback claimed by Subsidiary. Taxation maintained the disallowance was proper since Parent "had no tax liability from 2004-2007." It disagreed with Subsidiary's contention that inclusion of royalty income by Parent (even if Parent's ENI was $0 due to NOLs), requires those amounts be allowed as a business expense deduction to the Subsidiary since the "fact of any consequence is [that Parent] did not pay tax on the royalty income." Thus, for each tax year,

---

[5] Subsidiary reported similarly on the Schedule J for prior tax years (FYsE 2002; 2003; 2004).
[6] In Part IV of Schedule J, Subsidiary listed the "jurisdictions in which receipts are sourced" and the total amount non-sourced. For FYE 2005, it listed 33 States, for FYsE 2006 and 2007 it listed 27 States, and for FYE 2008 it listed 21 States.

Taxation added back $225,157,647; $192,392,385; $334,085,910; and $369,124,636 (the amounts claimed by Subsidiary as an exception to the addback) to Subsidiary's ENI. No changes were made to the addback exception for royalty payments to foreign related members, to the Subsidiary's allocation factor, or to the 55% rate of royalty/payment to Parent. Taxation did not pursue verification of the 55% rate since there would be "no tax benefit to New Jersey in reducing the rate."

The audit resulted in a total CBT of $4,735,253 (rounded) for FYsE 2005 to 2008. With penalty and interest, Taxation demanded a total of $7,000,280.83.

Subsidiary timely protested the audit administratively. It claimed that it had "erroneously added back" a portion of the payments to Parent since it was not licensing any intellectual property from Parent. Rather, it was buying prewritten software from Parent, and reselling the same to end-users, with Parent wrapping, packaging, and delivering the software directly to those end users. It therefore claimed a refund of $1,241,850. It alternatively claimed that it was "unreasonable" for Taxation to addback the royalty payments.

By its final determination, Taxation rejected Subsidiary's arguments and upheld the audit. Due to the Appellate Division's decision in Whirlpool Properties, Inc. v. Director, Div. of Taxation, 25 N.J. Tax 519 (App. Div. 2010), aff'd, 208 N.J. 141 (2011), Taxation increased Subsidiary's denominator of the sales fraction (for apportionment purposes) or the "everywhere" receipts for receipts from three States.

## ANALYSIS

*(A) Appropriateness of Summary Judgment*

Summary judgment will be granted "if the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no

11

genuine issue as to any material fact challenged and that the moving party is entitled to a judgment or order as a matter of law." R. 4:46-2(c); Brill v. Guardian Life Ins. Co. of Am., 142 N.J. 520, 523 (1995).

The issue here is whether Subsidiary's payments to Parent (1) qualify as intangible costs and expenses for purposes of N.J.S.A. 54:10A-4.4(b); and (2) if so, whether they qualify for an exception from the addback. Although each party disputes the other's characterization of the payments, the material facts needed to decide the issues are undisputed. Therefore, summary judgment is appropriate as to this issue.

*(B) CBT Statute's Addback of Otherwise Deductible Expenses*

The Legislature enacted the Business Tax Reform Act ("BTRA"), L. 2002, c. 40, to address declining revenues despite economic expansion based on "evidence that large corporations with apparently substantial economic activity in this State and substantial profit have managed to avoid having any of this income become taxable by New Jersey." Assembly Budget Committee, Statement to Assembly No. 2501 (June 27, 2002). This was a "trend . . . in 'separate entity' states like New Jersey, "where each corporate entity within an affiliated group computes its tax separately, and corporations may structure transactions between affiliates in various states to avoid tax." Id. The BTRA intended to achieve "equity between the corporations" which used tax avoidance "methods and those that cannot, or do not," by effectuating "loophole closers." Id.

One such "loophole closer" was the "disallowance of deduction of intangible expenses paid to a related party." Id. The BTRA would:

> limit[] the ability of a taxpayer to deduct royalties and other intangible expenses and costs . . . when paid to affiliates. The provision addresses, but does not solely apply to, a tax avoidance device that allows a multicorporate structure to export income from a state where the income is generated as a form of expense (for example, as a royalty payment to an out-of-state affiliate that the paying corporation

12

deducts from its income) and then import the income back (for example as a tax-free dividend or as a loan).

[Id.]

See also Senate Budget & Appropriations Committee, Statement to Senate No. 1556 (June 27, 2002) (same); 35 N.J.R. 1572 (April 7, 2003) ("social impact" of the BTRA and implementing regulations will restore "an even playing field" among corporations since "good tax policy . . . should not reward taxpayers simply because they are capable of" inter-corporate structuring); Morgan Stanley & Co. Inc. v. Director, Div. of Taxation, 28 N.J. Tax 197, 211-12 (Tax 2014) (although a deduction and capture of the corresponding income "may very well occur" when the parties to the transaction "are unrelated entities," the same transaction when occurring "where the parties are related," provides "a potential for abuse because the structuring of the transactions may be manipulated to produce . . . a tax-avoidance result").

The "disallowance of the deduction is the general rule." Statement to Assembly No. 2501, supra. Thus, N.J.S.A. 54:10A-4.4(b) presumptively denies a deduction of certain "otherwise deductible" expenses made by an entity to a related member. The statute reads as follows:

> For purposes of computing its [ENI]. . . a taxpayer shall add back otherwise deductible . . . intangible expenses and costs directly or indirectly paid, accrued or incurred to, or in connection directly or indirectly with one or more direct or indirect transactions with, one or more related members.
>
> [N.J.S.A. 54:10A-4.4(b).]

N.J.S.A. 54:10A-4.4(a) defines "intangible expenses and costs" to "include[]":

> . . . (1) expenses, losses and costs for, related to, or in connection directly or indirectly with the direct or indirect acquisition, use, maintenance or management, ownership, sale, exchange, or any other disposition of intangible property to the extent such amounts are allowed as deductions or costs in determining taxable income before operating loss deduction and special deductions for the taxable year under the federal Internal Revenue Code . . . ; (2) losses related to, or incurred in connection directly or indirectly with, factoring transactions or discounting

13

transactions; (3) royalty, patent, technical and copyright fees; (4) licensing fees; and (5) other similar expenses and costs.

In this connection the term "[i]ntangible property" is defined to "mean[] patents, patent applications, trade names, trademarks, service marks, copyrights, mask works, trade secrets and similar types of intangible assets." Ibid.

As pertinent here, Taxation's regulations track the statute and disallow a deduction for "intangible expenses and costs" paid to a related member. N.J.A.C. 18:7-5.18(b). The regulations similarly track the statutory definition of "intangible expenses and costs," and "intangible property." N.J.A.C. 18:7-5.18(b)(5)(v); (vi).

*(C) Are Subsidiary's Payments to Parent an Intangible Cost or Expense Subject to Addback?*

The plain language of the addback statute, which is undoubtedly broad in its reach, and the accompanying legislative history, weaken plaintiff's argument that only royalty income was the intended target of addback. Rather, royalty is but one example of an intangible expense. Licensing fees are specifically included as a separate category. "[O]ther similar expenses and costs" are also subject to the addback. Thus, even if Subsidiary calls its payments as licensing fees or management expense fees, those payments clearly fall within the scope of N.J.S.A. 54:10A-4.4(b).

Plaintiff claims that Subsidiary paid Parent the purchase price for the software (i.e., its COGS) since payments were a percentage of Subsidiary's revenues, which could only be from Subsidiary's sales of license and maintenance contracts to end users and since Parent shipped the ordered products to Subsidiary's customers, akin to a drop-shipment. Therefore, and regardless of the nomenclature "license" or "royalty" used in the Parent-Subsidiary License Agreement, Subsidiary claims that its payments are not within N.J.S.A. 54:10A-4.4(b) especially where

14

Subsidiary collected sales tax from the end users. Its argument in essence is that Parent sold Subsidiary tangible personal property, and Subsidiary in turn, resold the same to the end users.

In AccuZIP, Inc. v. Director, Div. of Taxation, 25 N.J. Tax 158 (Tax 2009), the Tax Court held that sale of prewritten software to end users who signed a license agreement was a sale of tangible personal property. There, one of the taxpayers developed and sold computer mailing software programs, which were sold "on CD-ROMS and contain[ed] a licensing agreement." Id. at 162. The end user could use one copy for one computer only or one buy one license per user, and could not reverse engineer, decompile or disassemble, sublicense, rent, or lease the software. Id. at 163. The software was owned by the taxpayer "or its suppliers, with a special distribution license to" a third party, and was copyrighted. Ibid. The other taxpayer "developed and copyrighted a desktop publishing computer program," which was embodied in computer disks and shipped to the end user with "a paperback tutorial guide, reference manual and user's guide," and "'shrink-wrapped' with a clear plastic film." Id. at 164. The "pre-packaged shrink-wrapped boxes" were sold to taxpayer's "distributors and resellers who resold the product to end users." Ibid. The "single-user" license agreement granted the end user a "nonexclusive license to" use the prewritten software, but title was not conveyed. Id. at 165. The end user could not modify or manipulate the prewritten software, nor rent, loan, or lease it. Ibid.

In deciding that the taxpayers did not have nexus to New Jersey for CBT purposes, the court held that regardless of the usage of a license agreement or the nomenclature of a license, the product being sold was prewritten computer software, thus was not intangible personal property. Id. at 170-73 (relying upon Treas. Reg. §1.861-18). The court found that the taxpayers "sell tangible copyrighted property in the form of CD-ROMs containing prewritten computer software," and the fees received were from "the single sale of their products and requested updates . . . and

not from any resale or royalty payments," or "from the use in New Jersey of their intangible personal property . . . [such as] trademarks and trade names." AccuZIP, supra, 25 N.J. Tax at 172. The court also noted that the taxpayers' "intellectual property" was not "displayed in New Jersey store locations to generate sales," and that they did not receive "royalty payments or licensing fees for" their "products." Id. at 172-73 (distinguishing the taxpayers from the economic nexus case Lanco, Inc. v. Director, Div. of Taxation, 188 N.J. 380 (2006), cert. denied, 551 U.S. 1131 (2007)).

The federal regulations relied upon in AccuZip, supra, as guidance, note that computer program transactions may involve the transfer of either "a copyright right," or of a "copy of the computer program" also called a "copyrighted article." Treas. Reg. §1.861-18(b)(1). A "right to a copyright" is transferred if the grantee can make copies of the computer programs for public distribution (by sale, loan, lease, or rental) or publicly display and perform the software. Treas. Reg. §§1-861-18(c)(1); (c)(2)(i)-(iv). In this connection, whether the transfer is a "sale" depends on whether "all substantial rights in the copyright" have been transferred. Treas. Reg. §1-861-18(f)(1). If not so transferred, then the transfer is "a license generating royalty income." Ibid. For instance, if a corporation grants a non-exclusive right to another entity to make copies of its prewritten computer program, and distribute them to the public for sale, in return for paying a certain amount based on "the number of disks copied and sold," the transfer is one of a copyright, the transaction is a license, and payments are royalties. Treas. Reg. §1-861-18(h), Example 6. The same result ensues if the program is copied onto the other entity's hard drive, and is transferred to the end users' hard drives, with or without an archival copy on a floppy. Id., Example 8.

On the other hand, "if there is a transfer of a computer program on a single disk for a one-time payment with restrictions on transfer and reverse engineering," the transfer is a "sale of a copyrighted article," even if the parties call it "a license" or "shrink-wrap licenses." Treas. Reg.

16

§1-861-18(g)(1); (g)(2). In this connection, a "copyrighted article" is transferred if it "includes a copy of a computer program from which the work can be perceived, reproduced, or otherwise communicated, either directly or with the aid of a machine or device." Treas. Reg. §1-861-18(c)(3). Whether the transfer is a "sale" depends on whether "the benefits and burdens of ownership have been transferred." Treas. Reg. §1-861-18(f)(2). If "insufficient benefits and burdens of ownership of the copyrighted article have been transferred, such that a person other than the transferee is properly treated as the owner of the copyrighted article," the transfer is deemed "a lease generating rental income." Ibid. For instance, an entity enters into a distribution agreement to buy copies of a computer program for sale to retailers from another entity which owns the copyright in the program. Treas. Reg. §1-861-18(h), Example 7. The selling entity ships the disks embodying the program with "shrink-wrap licenses." Ibid. The transfer is a purchase of copyrighted articles, regardless of the "use of the term license," since the buyer "acquired individual copies of" the program for sale to others. Ibid. The buyer is deemed an "owner" of the copyrighted articles, thus, the transaction is a "sale of copyrighted articles." Ibid.

Taxation persuasively notes that AccuZip is distinguishable on two primary grounds: First, the case did not interpret or implicate the addback statute. Rather, the issue was whether the taxpayers, foreign corporations, had nexus for CBT purposes. Second, the focus of the transaction was the sale to the end user by the parent and/or its distributer, either of which were unrelated to the end user. Here, however, the transactions being analyzed are between Parent and Subsidiary, related parties. Third, while there is the Parent-Subsidiary License Agreement as there is one between Subsidiary and its end user customers, and both grant a non-exclusive license to use, the former agreement is broader and different since it also includes a right to, and use of, a whole host of Parent's intellectual property in the computer products. The latter element was conspicuously

absent in AccuZip, supra. In fact, that case took care to state that the fees paid by end users were not "royalty payments or licensing fees."

Thus, that the transaction between Subsidiary and its end user may be considered as a "sale" of a copyrighted material, does not necessarily render or convert the transaction between Parent and Subsidiary into a purchase-sale of tangible personal property. See, e.g., Mobil Oil Corp. v Dep't of Treasury, 373 N.W.2d 730, 735-36 (Mich. 1985) (defining the term "royalty" in connection with copyrights as being a "[c]ompensation for the use of property, usually copyrighted material," or a "share of product or profit reserved by owner for permitting another to use the property") (citations omitted); Kelly Servs. v. Dep't of Treasury, 818 N.W.2d 482, 486 (Mich. Ct. App. 2012) (under dictionary meanings, "royalty income derives from the transfer of *the right to use property*, not from the transfer of *possession of property*"); Zenith Data Sys. v. Dep't of Treasury, 555 N.W.2d 264, 267 (Mich. Ct. App. 1996) (using the I.R.C. § 543(d) definition of royalties received for licensing of computer software to conclude that taxpayers who were in the business of "developing computers and computer software" receive royalties pursuant to "their agreements with third parties for the licensing of their computer software");[7] cf. also Grigoleit Co. v. Whirlpool Corp., 769 F.3d 966, 968 (7th Cir. 2014) (where the "caption on the contract is 'LICENSE AGREEMENT' and the heading on ¶3 is 'Royalties'" the court is "not obliged to treat" the contract as something else, since the "the deal is a patent license"). As noted:

> The agreements show every evidence of careful and skillful draftsmanship. And they are licenses in form in that the parties are described as licensor and licensee and the payments to be made under them are called royalties. Substance controls words to be sure, but when parties obviously skilled in the business at hand use words of art in formal documents carefully drawn we can only assume that the

---

[7] The Michigan cases were decided in the context of its Single Business Tax Act ("SBTA") which allowed companies to deduct royalty income in determining their tax base. The SBTA was repealed effective 2008.

words used were intended to mean what they say. We can hardly assume that their use was inadvertent or the product of bumbling draftsmanship.

[Redler Conveyor Co. v. Comm'r of Internal Revenue, 303 F.2d 567, 569 (1st Cir. 1962) (citation omitted).]

The facts here also support a similar conclusion. The agreement between Parent and Subsidiary was called License Agreement. It was for a term certain. The payment due was called royalties. Subsidiary could make mass copies of Parent's prewritten software for sale to its end users. Subsidiary's CBT returns consistently reported $0 as COGS in computing its ENI. Parent's CBT returns consistently reported royalty income on Schedules A and J.

More importantly, Parent retained full ownership of its intellectual property rights in the computer products, while Subsidiary could only use and possess such intellectual property, and then only within the scope of and for purposes explicated in the Parent-Subsidiary License Agreement, and further with certain territorial restrictions. Goodwill from use or sub-license of the software and intellectual property therein, inured only to Parent's benefit. Although the Forms 10-K filed with the SEC claim that Parent's channel partners which marketed/distributed Parent's products and services were deemed owners after Parent delivered the products to the end users, no such language appears in the Parent-Subsidiary License Agreement. In fact, Parent's Chief Intellectual Property Counsel explicated that ownership of the software, including the source code, trade names, and trademarks (the intellectual property), is never transferred to Subsidiary or by Subsidiary to the end user. What is transferred is a license to use only, since without such license Subsidiary cannot market or distribute Parent's prewritten computer products. In response to the question "selling the software requires being able to use its names," the representative stated: "Absolutely . . . you have to have the right to market and sell the product under its name. And that's essentially the trademark." She also pointed out that title to the software is "never

transferred," and "anyone who provides software is going to do it under a license agreement and under restricted terms." She agreed that a license agreement is commonly used in the software industry to protect against easy pirating and duplicating of software. All of these assertions, the plain language and tenor of the agreement, Parent's and Subsidiary's CBT returns, militate against plaintiff's attempt to recast the Parent-Subsidiary License Agreement as a buy-sell agreement between Parent and Subsidiary of tangible personal property.

Plaintiff's comparison of the transactions between Parent and Subsidiary as drop-shipments (because Parent ships the computer products to Subsidiary's customers) is unavailing. In cases involving those types of transactions, there was no retention of title to the goods by the seller, nor was there an issue of title to intellectual property in the goods sold. See Steelcase, Inc. v. Director, Div. of Taxation, 13 N.J. Tax 182 (Tax 1993) (sales tax matter where taxpayer manufactured and sold furniture to dealers, not end users, and shipped the furniture to dealer's customers if so requested); Stryker Corp. v. Director, Div. of Taxation, 168 N.J. 138, 143 (2001) (CBT case describing a drop-shipment as a "transaction, [where] a manufacturer sells merchandise to a dealer but ships the merchandise directly to the customer of the dealer").

The court is also unpersuaded by the argument that because Subsidiary's payments are 55% of gross license and maintenance revenues, and further because without the license agreement, Subsidiary could not distribute or sell Parent's prewritten software to end users, Parent sold Subsidiary copyrighted tangible personal property. Neither of these facts make the payments to Parent as Subsidiary's purchase costs. Using gross revenues is simply a basis for computing the payments. See, e.g., Mobil Oil Corp., supra, 373 N.W.2d at 736 (noting that royalty can be paid as "a percentage of the retail price of each copy [of an author's work] sold" or "as a percentage of receipts from using the property or as an account per unit produced"). Notably, even if the

20

license agreement expired or terminated, Subsidiary could be liable for "accrued" obligations under the agreement. One such obligation could be for unpaid royalties due by Subsidiary. Similarly, Parent reserved the right to audit Subsidiary's business records and accounts for "information bearing upon the amounts due and payable under this agreement." Such a provision is to ensure that the royalty payments are accurately computed. Additionally, an independent economic expert imputed a 2% profit margin on Subsidiary's sales, and translated this into an implied 56.9% "royalty" rate, not cost of goods. In this connection, the maintenance contracts although for services, include among others, a right to use copyrighted updates, thus, still come within the parameter of "royalty" for purposes of analyzing Subsidiary's payments.

In sum, and under the same federal income tax regulations relied upon in AccuZip, supra, the Parent-Subsidiary License Agreement encompassed the transfer of a license, which generates royalty income to Parent and produces a concurrent intangible cost/expense to Subsidiary is subject to N.J.S.A. 54:10A-4.4(b). That Subsidiary collected sales tax from the end users is irrelevant for purposes of the application of the addback statute.

*(D) Can Subsidiary's Payments to Parent be Excepted from the Addback Provisions?*

Although the BTRA intended to close loopholes by disallowing deductions for intangible costs/expenses, it "continued to allow such deductions in areas that are established as 'non-tax avoidance' situations." Statement to Assembly No. 2501, supra. A deduction is permitted:

> if: (a) the . . . intangible expenses and costs are directly or indirectly paid, accrued or incurred to a related member in a foreign nation which has in force a comprehensive income tax treaty with the United States; or (b) the taxpayer establishes by clear and convincing evidence, as determined by the director, that the adjustments are unreasonable; or (c) the taxpayer and the director agree in writing to the application or use of an alternative method of apportionment . . . .
>
> [N.J.S.A. 54:10A-4.4(c)(1).]

Taxation's regulations track the statute by allowing a deduction if the intangible expenses were incurred or paid to a related member in a foreign country covered by a tax treaty. N.J.A.C. 18:7-5.18(b)(1). Similarly, a deduction is allowed if a portion of such expense was paid or received by an unrelated member, and the transaction between the taxpayer and the related member was not for the principal purpose of tax avoidance. N.J.A.C. 18:7-5.18(b)(2). In addition, although not so stated in the statute, a taxpayer can also deduct such expenses if it can show that the recipient of the payment "pays tax to New Jersey on the income stream." N.J.A.C. 18:7-5.18(b)(3). Schedule G-1 of the CBT return notes that a deduction (i.e., an exception from addback) is allowed if the "intangible expenses and costs were directly or indirectly paid, accrued or incurred to a related member that is a corporation that files a [CBT] return . . . , and such member has included those amounts in its entire net income." This is a "discretionary exception to prevent the double payment of tax." 35 N.J.R. 4310(a) (Sep. 15, 2003). If however, the related member's tax liability was not greater than the statutory minimum tax, then the taxpayer (i.e., payor of the royalty income), is not entitled to the deduction (i.e., the add-back will be required). See Schedule G-1, supra.

In Morgan Stanley, supra, this court first noted that non-payment of CBT upon the added back income (there, interest, and under the "subject to tax" exception of a separate statute N.J.S.A. 54:10A-4(k)(2)(I)) due to offset of income by losses, does not bar a taxpayer from proving that the addback (or disallowance of a deduction) would be unreasonable. 28 N.J. Tax at 224.[8] The court

_____

[8] Unlike the intangible cost/expense addback statute, the related party interest addback statute allows a deduction if, among others, the related member "was subject to tax on its net income or receipts" in any State including New Jersey, and "a measure of the tax includes the interest received from the related member." N.J.S.A. 54:10A-4(k)(2)(I) (emphasis added). This "subject to tax" exception does not require actual payment of CBT on the interest income by the payee. N.J.A.C. 18:7-5.18(a)(1)(iii). In Morgan Stanley, supra, the court held inclusion of interest income in the return, and offset of the same by losses, thus, payment of minimum tax does not satisfy the "subject to tax" prong of the statute excepting such interest from being added back. 28 N.J. Tax at 215. The court noted that the minimum tax is not one "calculated with reference to" the interest income. Ibid. Although the intangible expense statute does not specify a "subject to tax" exception, including language that the tax "measure" includes the addback item, Taxation's

22

observed that since the interest addback statute's "unreasonable" exception language "follows a provision clearly requiring the demonstration of the payment of tax, it seems unlikely that the Legislature intended the unreasonable exception to include a similar requirement, but neglected to include such language." Ibid. Therefore, and since Taxation's own regulations allowed for proof of another exception, non-payment of CBT upon the income subject to the addback cannot end the inquiry. Id. at 224-26.

This court finds this logic equally applicable here. This is because, one, the plain intent of the BTRA was to capture the income being shifted. Although this could implicate the ability to collect CBT on such income, CBT provisions allowing offset of ENI by losses, current or carry forwards were not concurrently amended in this regard. Thus, if the BTRA's intent was to ensure CBT collection/payment, the Legislature could have, but did not, provide that the addback of intangible expenses should be after the deduction for NOLs.[9] Alternatively, it could have provided that items of addback intangible income cannot be offset by NOLs. By not insulating the royalty or other intangible income received by the related member payee from being offset by NOLs (or barring the related member payor from using NOLs), the Legislature's focus appears to have been to capture such income so it would be taxable. It was not that CBT be actually paid on the items of added back intangible expense. Two, the "unreasonable" exception language in the interest expense addback statute is identical to the language in the intangible expense/cost statute. See N.J.S.A. 54:10A-4(k)(2)(I). Therefore, the reasoning of Morgan Stanley in this regard squarely

---

regulation, N.J.A.C. 18:7-5.18(b)(3) attempts to achieve a somewhat similar result as the interest addback statute when providing an exception to the addback if the related member paid tax on that "income stream."

[9] Although the starting point for computation of ENI is the amount reported federally, the statute makes it clear that this is "before" NOL and other "special deductions." N.J.S.A. 54:10A-4(k). It then lists items that must be added back to the ENI (i.e., "without the exclusion, deduction or credit"). N.J.S.A. 54:10A:4-(k)(2). After such addbacks, the statute allows an NOL deduction. N.J.S.A. 54:10A-4(k)(6).

23

applies. Finally, the intangible expense/cost addback statute does not contain a "subject to tax" exception as does the interest addback statute for Taxation to insist that payment of CBT on the royalty income is the be-all and end-all of its inquiry under the BTRA. This is especially so when the statute gives Taxation the authority to require "clear and convincing" proof that the addback is unreasonable.

In Morgan Stanley, supra, the court explained that because the Legislature determined to addback what was ordinarily deductible business expenses (i.e., what is generally allowed as a legitimate business expense) due to the relation between the parties to the transaction, it meant that simply proving that the transaction had economic substance or a "valid non-tax business purpose" was not enough. 28 N.J. Tax at 219. As non-exhaustive examples, the court noted circumstances likely to establish unreasonableness would be "unfair duplicative taxation; a technical failure to qualify the transactions under the statutory exceptions; an inability or impediment to meet the requirements due to legal or financial constraints; an unconstitutional result; a demonstration that the transaction for all intents and purposes is an unrelated . . . transaction." Id. at 220. The court however "expressly reject[ed]" the argument "that a related party transaction which has a valid non-tax business motive and economic purpose, without more, would qualify the transaction for the deduction." Id. at 221. This court agrees. Else, there would be no need for the "clear and convincing" heightened burden of proof cast upon the related member taxpayer by the statute.

Plaintiff argues that the addback should be excepted under the unreasonable exception for several reasons. These are:

(1) there is no income shifting since the royalty/fee agreement is not between an in-State member-payor-licensee, and an out-of-State member-payee-licensor-owner of the intellectual property, the target of the addback statute;

(2) the payment of the royalty/fee is indispensable and integral to Subsidiary's ability to generate business income since the ability to sell is contingent upon software licensing unlike other businesses;

(3) New Jersey has actually obtained more CBT despite the related party transaction here because the CBT which would have been paid had the related members done the same transaction as a single entity would have been about $1 million less;

(4) Parent paid CBT on the royalty income each year at issue because it included the same when computing its ENI, regardless of the fact that the income was offset by NOLs and dividend income exclusion which reduced the ENI to zero;

(5) Parent paid CBT on the royalty income each year at issue because its use of prior years' NOLs to offset the income generated by royalties reduced its NOL "bank," thus, it had to pay more CBT in tax years subsequent to the ones at issue. This "cost" (i.e., loss of ability to use NOLs) of $824,516, shows that it paid CBT for the years at issue on the royalty income.

(6) Parent's inability to pay CBT was due to its prior NOLs which zeroed out the ENI, thus the addback is unreasonable since there was a "technical failure to qualify for" the addback exception;

(7) The Parent-Subsidiary License Agreement was "for all intents and purposes" equal to unrelated party transaction.

Taxation counters as follows:

(1) N.J.S.A. 54:10A-4.4(b) was not limited to in-state and out-of-state related member transactions;

(2) If both members filed as one entity, Parent's NOLs would have increased by $335,364,038, which were Subsidiary's ENI for FYsE 2002-2004, during which years Parent had considerable NOLs;

(3) Income of about $1.45 billion in royalty was shifted by Subsidiary (the income generating member) to Parent (the loss generating member), which paid minimum CBT for the years at issue since Parent's NOLs swallowed the royalty income received from Subsidiary, thus New Jersey actually lost $4,721,207, its audited CBT amount (which is Parent's "tax savings");

(4) Subsidiary's 2008 merger into Parent strangely coincided with Parent's full use of, and anticipated exhaustion of Parent's prior years' NOLs some of which were due to expire;

(5) The alleged "cost" of the loss use of Parent's NOLs for subsequent tax years of $824,516 (alleged to be equivalent of the CBT Parent paid for the tax years at issue) was in realty a net tax savings of $3,896,691 to Plaintiff since it actually owed $4,721,207 (the audited CBT amount);

(6) The Parent-Subsidiary License Agreement is not the same as the unrelated license agreements since there are different payment rates, which were lower;

(7) The court should deem 45% to be the prevailing royalty rates based on the actual third-party agreements as opposed to the economic expert's conclusion based on unreliable data.

All but one of plaintiff's arguments are unpersuasive for the following reasons. That licensing fee or royalty expenses are integral to Subsidiary's ability to generate income does not remove it from the addback provision. Morgan Stanley, supra, clearly explicates that such an argument "disregards the Legislature's decision to deny the deduction to related party transactions in the first place and would render the statutory provision disallowing the deduction meaningless." 28 N.J. Tax at 221. In this connection, the software business is not so unique as to require payment of royalties for use of a software license. See generally Xuan-Thao N. Nguyen, Holding Intellectual Property, 39 Ga. L. Rev. 1155, 1159 & n.7 (Summer 2005) ("Rapid change in science and technology, coupled with expansion of legal protection" are responsible for creating intellectual property as a "valuable intangible corporate asset," and the expansion of legal protection is "evidenced by the recognition of patent protection in biotech, computer software, and Internet industries").

It is true that Parent and Subsidiary are subject to the CBT and New Jersey's taxing jurisdiction although both are foreign companies (and did not, as is wont to frequently occur, claim lack of physical or economic presence in New Jersey for the first time during an audit). However, the Legislature did not limit the addback statute to transactions involving in-state payees and out-of-state payors. See Statement to Assembly No. 2501, supra (the BTRA "addresses, but does not apply solely to, a tax avoidance device that allows a multicorporate structure to export income" (via expense deduction) outside New Jersey and then "import the income back") (emphasis added).

Plaintiff's argument that New Jersey has actually obtained over $1 million in CBT than it would have received had the related members been treated as a single entity,[10] is considerably

_____

[10] Plaintiff provided a chart (subsequent to federal changes) showing the ENI of the Parent and of the Subsidiary using the numbers from Line 34 of Schedule A (thus in case of Subsidiary, including the addback amounts), and the tax paid by each entity (in Parent's case it was the Alternative Minimum Tax since the CBT was $0 due to NOLs) totaling

weakened because plaintiff is seeking a refund of $1,241,850 on grounds the addback was erroneous. Thus, less is ultimately, and actually, being paid as tax to New Jersey.

Parent's choice and impetus to use its prior years' NOLs under a different statute does not translate to its "cost" of giving up the use of those NOLs for subsequent tax years, and thereby equate to payment of CBT for the tax years at issue, or to a technical failure to qualify for the addback exception. The use of, and time period to use the NOLs is not a direct or indirect function of the addback statute, but rather of an entirely different statute. See N.J.S.A. 54:10A-4(k)(6).[11] An argument that but for the use of NOLs Parent would have paid the CBT on the royalty income will defeat application of the addback statute since it is Parent's choice to minimize its CBT liability using its NOLs. There is no duplicative taxation since Parent paid only a minimum tax due to the availability of the NOLs.

Plaintiff however has a meritorious argument in the Parent-Subsidiary License Agreement being barely different from the license agreements between Parent and/or Subsidiary and unrelated third parties. Although all those agreements had Parent or Subsidiary acting as the distributor, reseller or sub-licensee (thus, payments were made by Parent or Subsidiary to the third party), the subject of the agreements with the related parties, viz., software licenses for the computer products (software programs) and maintenance services were the same as was in the Parent-Subsidiary agreement. So was the object, viz., to market, distribute, sub-license, and sell computer products and services to end users. The licenses to Parent or Subsidiary were all non-exclusive and non-

___

$2,682,883. In a separate column, it showed the total income and computed the CBT (after NOLs and dividend income exclusion) for each FYE totaling $1,562,559.

[11] NOLs can be carried forward for seven tax years. N.J.S.A. 54:10A-4(k)(6)(B). For periods after June 30, 2009, the carryover period is for "each of the twenty privilege periods" following. Ibid. No deduction for NOL carryovers was allowed for calendar years 2002 and 2003, and for calendar years 2004 and 2005, a deduction for NOL was limited to 50% of ENI. N.J.S.A. 54:10A-4(k)(6)(E).

transferable, and the third party always retained title to its intellectual property.  Intellectual property and other proprietary information was confidential.  The third party had the right to audit and/or receive reports of the end user's or buyer's information plus sales amounts so the third party could verify amounts paid to it by Parent or Subsidiary.  The sample agreements were for relatively short periods and some depended upon the contract with the end user.  Payments by Parent or Subsidiary (and in one instance, payment to Parent) were computed as a percentage of the sales of computer products (licenses) and services.  Additionally, Parent and Subsidiary had their own operations, each having several hundred employees and offices nation-wide.  Parent undertook actual and active business activities (creation, development, and distribution of proprietary software and related services), as did Subsidiary (marketing, distribution, sale, sub-licensing of Parent's and unrelated third party's computer products).  Subsidiary generated its own NOLs for one tax year, and was created in 1996, prior to Parent's NOLs for FYsE 2002 and onwards.  Thus, neither was a shell entity with no business operations other than passively holding an intangible asset, or with no business purpose for their existence other than to receive income or expense an intangible cost and divert income from/to related members.[12]

Taxation's contentions that this entire argument is meritless because the payment structure is different are unpersuasive.  Although the Subsidiary's payments were based as a percentage of the lump sum of license and maintenance contracts, whereas the third-party agreements allocated differing percentages to the different contracts (license versus services; perpetual versus term licenses), the splitting of rates does not require a conclusion that income shifting for addback

---

[12] Taxation points out that Subsidiary's merger in 2008 coincided with Parent's full use of its NOLs by that time, thus, the Parent-Subsidiary license agreement was purposed to avoid paying CBT on the fee/royalty income.  However, Subsidiary was not created in 2002 for purposes of absorbing Parent's NOLs.  Rather, the CBT returns indicate it was incorporated in 1996.  Moreover, even after Subsidiary's merger, Parent still generated a NOL for FYE 2009 of about $27 million.

purposes occurred. This is because the types of products and services for which the royalty/license fee was being paid by or to Parent or Subsidiary were the same: i.e., prewritten computer software, the subject of the license contracts, and maintenance/update, the object of the service contracts. These two items comprised the primary source of Parent's gross receipts shown on its Forms 10-K. Additionally, plaintiff also provided a computation showing that if the tiered rates were applied to the total revenue generated by Subsidiary for all tax years, the royalty/fees that would have been paid would have been higher or somewhat lower than the 55% royalty paid by Subsidiary to Parent.[13]

Taxation argues that should this court determine that an exception to addback applies, then the rate should be 45% based on the sample agreements since the independent economic expert's agreement that 55% rate was reasonable never used these samples. The court is not persuaded. First, the 55% was based upon revenues from products (software license contracts) plus maintenance (service) contracts. Yet, Taxation focuses only upon the 40%-45% tiered rate for the software contracts. In doing so, it implies that maintenance contracts generate no royalty income to Parent. This contradicts its own arguments that payments by Subsidiary are royalties regardless of a portion based upon sale of maintenance contracts (as noted above, the maintenance contracts although for services, include among others, a right to use copyrighted updates). In this context it should be noted that during the audit Taxation did not question the veracity or the quantum of the 55% rate since it would not provide any "tax benefit to New Jersey in reducing the rate."

---

[13] Plaintiff converted the 55% royalties to Subsidiary's total revenues (about $2.8 billion for the tax years at issue here). It then allocated those revenues to product sales and service contract sales (based on the aggregates reported for each year on the Forms 10-K which showed gross revenues from software; maintenance and professional services). It then applied the tiered royalty/license fee rates from five of the sample agreements to these allocations. The resulting royalty/fee payments ranged from a high of $1.7 billion to a low of $1.39 billion, for an average of about $1.55 billion and a median of $1.5 billion as compared to the $1.45 billion paid by Subsidiary to Parent.

Second, Taxation argues that the 55% endorsed by the unrelated economic expert's opinion (proffered by plaintiff) is unreliable because the opinion is not credible. This court is however not relying upon this expert opinion to base its conclusion. Moreover, Taxation itself moved for summary judgement and did not offer any data or other opinion to establish that a trial is required or that the opinion is valueless. Thus, Taxation's contention that 2% operating profit margin (opined by the expert) is too low is void of objective data in support. Its contention that the expert should have used the sample agreements (provided here) is meritless since 90% of them were entered into after the expert opinion was provided. The court is also unpersuaded by its argument that the expert opinion is suspect simply because it was issued 26 days after the Parent-Subsidiary License Agreement.

For all these reasons, the court finds that based on the facts herein, Subsidiary's payments to Parent for the tax years at issue here qualify as an exception to the addback statute because they were substantively equivalent to an unrelated party transaction. Because of this finding, the arguments about the imposition of interest and penalties are moot, since the assessment due to denial of the addback exclusion would be eliminated.

*(E) Taxation's Application of the Throw-Out Rule*

The Throw-Out Rule was enacted in 2002. It modified the calculation of the denominator of the sales factor (i.e., an entity's worldwide or everywhere receipts) to exclude any receipts which "would be assigned to a state . . . or to any foreign country," wherein the entity "is not subject to tax on or measured by profits or income, or business presence or business activity." N.J.S.A. 54:10A-6(B)(6)(now repealed). In Whirlpool, supra, the Court explained the purpose of the Throw-Out Rule thus:

30

Without application of the Throw-Out Rule, the sales fraction is calculated by dividing the taxpayer's New Jersey receipts by total receipts of the corporate taxpayer. N.J.S.A. 54:10A-6(B). The Throw-Out Rule modifies the sales fraction, transforming the fraction into one that divides New Jersey receipts only by taxed receipts. The effect is consistent: By throwing out receipts from the denominator, the sales fraction always increases, causing the apportionment formula and the taxpayer's resultant CBT liability to New Jersey to increase.

[208 N.J. at 151.]

See also Lorillard Licensing Co. L.L.C. v. Director, Div. of Taxation, 28 N.J. Tax 590 (Tax 2014), aff'd., 29 N.J. Tax 275 (App. Div. 2015), certif. denied, 226 N.J. 212 (2016) (subsidiary which received royalty income from parent which used such property to sell cigarettes in all 50 States had economic nexus nation-wide, thus, application of throw-out rule improper).

Here, Taxation increased the denominator of the sales fraction from what was self-reported by Subsidiary, to include receipts from three States. Plaintiff claims Taxation erroneously threw out these receipts if Subsidiary's sales were of intellectual property pursuant to Lorillard, supra. It also clarified that if Subsidiary's sales to its end users were deemed to be tangible personal property, then the self-reported throw-out amounts were erroneous for each year due to subsequent case law in this regard (citing to this court's unpublished decision in Elan Pharmaceuticals, Inc. v. Director, Div. of Taxation, Dkt. No. 010589-2010 (Feb. 6 2017)).

Taxation argues that if Subsidiary's receipts were from intangible personal property, then neither Whirlpool nor Lorillard, supra, apply since those cases were limited to intangible holding companies, especially since AccuZip, supra, ruled that out-of-State software distributors do not have economic nexus. It contends that if the Subsidiary's sales to its end users were deemed to be tangible personal property, then, it has no proof of which State and why that State would not have constitutional nexus to tax Subsidiary.

31

Pursuant to <u>AccuZip</u>, <u>supra</u>, the transactions between Subsidiary and its end users could very well be sales of a tangible product, <u>i.e.</u>, the copyrighted material. There is no proof that Subsidiary owned the copyrighted software (either Parent's or that of the unrelated party in the one sample agreement). Additionally, on Schedule J of its CBT returns for each year at issue here, it only reported sales from tangible personal property. However, except for FYE 2008, it reported small amounts of income as royalties on Schedule A of the CBT returns. Additionally, nothing was provided as to how many and why other States could constitutionally tax Subsidiary's receipts. This issue therefore, as Taxation correctly points out, is not ripe for summary judgment.

## CONCLUSION

Plaintiff's summary judgment motion is granted on the issue of exclusion to the addback of intangible expense/costs, rendering moot the parties' arguments as to the underpayment and amnesty penalties. Summary judgment motions as to the Subsidiary's apportionment factor are denied.